



*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 23, 2024

**By ECF**
The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Kareem Shepherd*, 22 Cr. 514 (PGG)

Dear Judge Gardephe:

      The Government respectfully submits this letter in advance of the February 5, 2024 sentencing of the defendant, Kareem Shepherd. For the reasons set forth below, the Government, in accord with the recommendation of the United States Probation Office ("Probation"), submits that a sentence below the stipulated Guidelines sentence of 114 months' imprisonment, but no less than 84 months' imprisonment, is necessary and appropriate in this case.[1]

**I.**      **Offense Conduct**

## The Scheme

      This case charges nine individuals (the "Defendants") for their participation in a multi-year scheme spanning from approximately December 2018 to September 2022 to steal credit cards from the mail; use those stolen credit cards at a variety of stores, including high-end retailers; and sell some of the merchandise purchased with the stolen cards online (the "Scheme"). (Presentence Investigation Report ("PSR") ¶ 31). Conservatively, the Scheme resulted in actual loss in excess of $500,000 and intended loss in excess of $1.3 million. (*Id.*) The Scheme victimized hundreds of individuals who had their mail and personal identification stolen by the Defendants. (*Id.*)

      In order to obtain credit cards for use in the Scheme, beginning in December 2018, Rashaan Richards, a/k/a "Jay Dee," a/k/a "JD," a/k/a "Payso," Devon Richards, a/k/a "Dev," and Kareem Shepherd, a/k/a "Reem," a/k/a "Marcus Ford," a/k/a "Frank James," conspired with mail carriers from the United States Postal Service ("USPS"), including Fabiola Mompoint, a/k/a "Lady Fab," Nathanael Foucault, Johnathan Persaud, a/k/a "Junzie-J," (the "Carriers") and others, to steal credit cards from the mail. (PSR ¶ 32). At the direction of Johnny Damus, a/k/a "Ace," members of the conspiracy, including R. Richards, D. Richards, Shepherd, Conrad Heron, a/k/a "Conny Cash," and Louis Jeune Verly, a/k/a "Luis Jesus Virola,"(the "Shoppers") used the stolen credit cards at

---

[1] The recommendation of 84 months' imprisonment includes a 24-month mandatory sentence for Shepherd's conviction for aggravated identity theft, in violation of 18 U.S.C. § 1028A, which must be imposed consecutive to any other sentence.

January 23, 2024
Page 2

a variety of stores, including high-end retailers in Manhattan, resulting in over $1.4 million in charges to the credit card companies. (PSR ¶ 33). Below are examples of the luxury items purchased with stolen credit cards during the Scheme.[2]

 

In the course of completing hundreds of fraudulent transactions during the Scheme, the Shoppers, including Shepherd, were repeatedly captured on store surveillance and, on some occasions, arrested in the course of individual transactions. (PSR ¶ 33). For example, below are still images from surveillance video recorded on or about August 23, 2020 outside of a retail store showing what the investigation revealed was a meeting during which R. Richards collected stolen credit cards, and merchandise purchased with those credit cards, from the other Shoppers, including, among others, D. Richards and Heron.

 

---

[2] Unless otherwise noted, the photographs herein were seized from cellphones searched pursuant to search warrants during the investigation. The two images provided here are examples of the *hundreds* of seized photographs depicting pieces of merchandise purchased fraudulently by the Defendants.

January 23, 2024
Page 3

  Similarly, below are additional still images from surveillance video recorded on or about September 13, 2020 by a retail store showing Shoppers (from left to right) R. Richards and D. Richards shopping with stolen credit cards and exchanging messages with each other about whether each credit card had been "approved" or "declined."  Through those messages, R. Richards and D. Richards were tracking whether the Defendants were able to use the stolen credit cards to successfully complete the fraudulent transactions.





January 23, 2024
Page 4

Below are additional, still images from surveillance videos recorded on different dates during the Scheme by retail stores showing Shoppers (from left to right) R. Richards, C. Heron, D. Richards, and Shepherd shopping with stolen credit cards.

   

In order to make the Scheme more efficient, in some instances, the Shoppers took advantage of relationships with sales associates at particular retailers who were willing to apply additional discounts to purchases, check inventory, and allow the Shoppers to use multiple credit cards in a variety of names in order to complete transactions. (PSR ¶ 34). Sometimes, the Shoppers coordinated with sales associates in advance to make sure there would be someone available to complete their obviously fraudulent transactions without making additional inquiries. (*Id.*). For example, below is a screenshot of a chat between a sales associate at a luxury retail store (the blue text messages) and D. Richards (the white text messages) between on or about January 26 and February 2, 2021, demonstrating the relationship between D. Richards and the sales associate and discussing luxury items, such as belts, purses (*i.e.*, "discos," a reference to Gucci Soho Disco purses), and wallets.



January 23, 2024
Page 5

       Central to the success of the Scheme was the willingness of employees of the U.S. Postal Service to abuse their positions of trust by accepting cash and gifts in exchange for stolen mail. (PSR ¶ 35). In many cases, the stolen credit cards—generally referred to as "not received as issued" cards, or "NRI Cards"—were brought to the attention of law enforcement by individuals either (i) expecting to receive credit cards in the mail from credit card companies or (ii) individuals who identified fraudulent charges on their credit card statements. (*Id.*). Over the course of the investigation, law enforcement linked the NRI cards to particular mail routes and ultimately, particular mail carriers—including Mompoint, Persaud, and Foucault. (PSR ¶ 36). The Carriers, acting at the direction of the Shoppers, stole credit cards from the mail and delivered them to the Shoppers in exchange for cash and merchandise. (*Id.*). Below is an example of a photograph of opened mail and a credit card from Foucault's postal route, which Foucault sent to R. Richards to inquire whether R. Richards was interested in the stolen card. R. Richards confirmed that he was, and the card was later used to make fraudulent luxury purchases at luxury stores in White Plains and Manhattan.



       In order for the Scheme to succeed, the Shoppers needed to be able to activate NRI Cards once they received them from the Carriers. (PSR ¶ 37). To do so, the Shoppers worked together to obtain personal identification information ("PII") using a variety of internet-based sources so that they could provide credit card companies with the information necessary to activate and use the NRI Cards. (*Id.*). For example, on or about October 27, 2019, Heron texted R. Richards and said, "Send info for [Victim-1]." (PSR ¶ 38). R. Richards then sent a photograph, containing PII for Victim-1. (*Id.*). Heron then sent a quizzical emoji, to which R. Richards responded, "What." (*Id.*). Heron then said, "Still activating." (*Id.*). Later that day, R. Richards texted Heron, "O[n] m[y] w[ay] to [the retail store]"—presumably so that they could use the stolen card that Heron had activated—and Heron responded, "We here." (*Id.*).

January 23, 2024
Page 6

On some occasions, in a single day, the Shoppers exchanged PII for dozens of victims while making purchases at high-end retailers. (*Id.*). In another example, between on or about September 18, 2020 and November 5, 2021, Verly and R. Richards exchanged more than 75 screenshots of PII. Below is a screenshot of just some of that PII; each thumbnail icon represents the PII of one victim.



Following their purchases, the Shoppers transferred some of the fraudulently obtained items to Damus who, working together with a close associate ("CC-1"), sold the items on a particular website, LuxurySnob.com. (PSR ¶ 39). LuxurySnob purports to be an "online consignment and personal shopping company" specializing in "pre-owned luxury items." (*Id.*). Brands regularly available on LuxurySnob include, among others, Gucci, Chanel, Fendi, Burberry,

January 23, 2024
Page 7

Balenciaga, Hermes, and Louis Vuitton. (*Id.*). Despite the assertions on the website that the items for sale on the website are consignment goods in excellent condition, many of the items sold on LuxurySnob.com were in fact purchased new by the Shoppers using stolen credit cards. (*Id.*). Below are screenshots of LuxurySnob.com advertising the sale of alleged consignment purses, which are the same brand and type of purse (Gucci Soho Disco) that the Shoppers frequently purchased for Damus using NRI Cards.



The Scheme was deliberate, sophisticated, and well organized. Throughout the Scheme, Damus took steps to ensure that items would be suitable for sale on LuxurySnob.com. (PSR ¶ 40). To do so, Damus worked with the Shoppers to make sure that he had a supply of branded boxes and bags from luxury retailers to package items sold on LuxurySnob.com including merchandise from "Dior, [G]ucci, Chanel, louis"—references to luxury brands Dior, Gucci, Chanel, and Louis Vuitton. (*Id.*). The Shoppers also took care to ensure that they obtained certificates of authenticity for items, such as Chanel purses. (*Id.*). Below is a screenshot from LuxurySnob.com representing to customers that certain items will come with their original boxes, dust bags, and authenticity certificates.

Do items come with original packaging and paperwork?

Items that come with their original boxes, dust bags, authenticity certificates, and manuals will contain the appropriate message in their product descriptions. Every order that ships is presented and packaged to standards that match or exceed luxury retail stores.

**Conduct Specific to Kareem Shepherd**

*Overview of Shepherd's Role in the Scheme*

Shepherd was aware of and involved in all aspects of the multi-year Scheme. (*See* PSR ¶ 64; Dkt. 276 ("Shepherd Sentencing Ltr.") at 2 (admitting that Shepherd knew "the scope and extent of the conspiracy")). Accordingly, he is responsible for the total loss generated by the

conspiracy, which is conservatively $1.3 million in intended loss and $536,434.01 in actual loss. (PSR ¶ 64).

During the Scheme, Shepherd (i) recruited postal carriers and obtained stolen credit cards from them; (ii) acted as a Shopper, activating stolen credit cards using PII and using those activated credit cards at luxury retailers in Manhattan and big box stores in the tri-state area; and (iii) communicated with co-conspirators to coordinate purchases and transfer stolen goods, including with Damus to purchase items for LuxurySnob. (PSR ¶ 41). As discussed in more detail below, Shepherd's involvement in the Scheme began shortly after he was released from prison in or about August 2018 following a conviction for identity theft and continued despite an arrest in or about August 2021 for engaging in fraudulent transactions. (*See id.* ¶¶ 48, 75, 99).

*Shepherd's Involvement with Postal Carriers*

Shepherd recruited United States Postal Service mail carriers, who were central to the Scheme's success because they stole the credit cards that Shoppers like Shepherd activated and used to purchase stolen goods. (*See id.* ¶ 35). Beginning in at least in or about March 2020, Shepherd obtained stolen credit cards from USPS mail carrier and co-defendant Fabiola Mompoint.[3] (PSR ¶ 41). Over the course of the Scheme, Mompoint obtained at least 79 stolen credit cards for Shepherd, resulting in approximately $91,456.39 in confirmed loss and $161,676.09 in intended loss.

Shepherd frequently communicated with Mompoint via cellphone about the Scheme. (*Id.*). For example, on or about September 9, 2020, Mompoint texted Shepherd, inquiring about his location, and the two arranged a meeting. (*Id.* ¶ 43). Shepherd asked, "[h]ow much I owe you," to which Mompoint responded, "I have 5. But im not sure about 1." (*Id.*). In this conversation, Shepherd was asking Mompoint how many credit cards she had stolen from the mail, and Mompoint stated that she had five but was unsure if one could be used. (*Id.*).

Shepherd paid Mompoint in a number of ways, including cash, via CashApp, and with luxury items. (*Id.* ¶ 44). For example, on or about October 2, 2020, Shepherd asked Mompoint, "how much I owe u," to which Mompoint responded, "Carry $500 on u just in case. U have to look first." (*Id.*). In this exchange, Mompoint was advising Shepherd that he should bring $500 with him in case he decides he would like to purchase all of the stolen mail Mompoint had. (*Id.*). Similarly, on or about October 10, 2020, Mompoint said, "$400. 3 of what u like and something else," which was followed by a meeting between Shepherd and Mompoint. (*Id.* ¶ 45). In addition to an unknown sum of cash, Shepherd paid Mompoint at least $10,000 using a mobile banking application. (*Id.*).

---

[3] Mompoint provided conflicting accounts as to how she was recruited to engage in the Scheme. In or about December 2022, she told law enforcement that Shepherd approached her on the street when she was in uniform. After she was arrested, Mompoint said she was introduced to Shepherd by someone whom she was dating.

Shepherd also paid Mompoint in luxury goods. (*Id.* ¶ 46). For example, on or about March 13, 2021, Mompoint texted Shepherd a picture of a pair of designer shoes and said, "GM. I want these instead. Sz 8. Whatever I got is all u today," to which Shepherd responded, "ok." (*Id.*).

Mompoint is not the only postal carrier whom Shepherd worked with. (*See id.* ¶ 41). For example, Shepherd communicated and met with another mail carrier ("Mail Carrier-2"), whom Mompoint connected to Shepherd. Shepherd's cellphone contained numerous photographs of stolen mail that was supposed to have been delivered to Mail Carrier-2's assigned zipcode. Some of these photographs are copied below:



*Shepherd's Role as a Shopper*

As noted above, Shepherd also acted as Shopper during the Scheme, activating the stolen credit cards he obtained from the postal carriers using stolen PII of the cardholder, and then in turn using those cards to make fraudulent purchases at various retail stores. (*Id.* ¶ 41). He communicated with other Shoppers, including Rashaan Richards, in order to carry out this portion of the Scheme. (*See id.* ¶¶ 54-55). For example, to activate stolen credit cards, Shepherd messaged R. Richards on Telegram on or about May 14, 2021, saying, "Send me Marco TLO,"[4] to which R. Richards responded with PII of four individuals, including someone named Marco. (*See id.* ¶ 55). Shepherd also messaged R. Richards about the fraudulent purchases, including on or about May 7, 2021, when Shepherd messaged R. Richards on Telegram to ask R. Richards if he remembered the name he made a Dior purchase under because the store was giving Shepherd problems with a return. (*Id.* ¶ 54).

Shepherd continued to engage in this behavior despite being arrested during the course of the Scheme. (*See id.* ¶¶ 47, 49). On or about June 7, 2021, an individual reported several fraudulent transactions that appeared on his credit card. One of the transactions was a charge for approximately $1,830.92 at a car dealership (the "Dealership") in Brooklyn, New York that took place on or about May 25, 2021. (*Id.* ¶ 48). The Dealership reported that the customer who completed that transaction had provided a phone number later identified as Shepherd's phone number. (*Id.*). On or about June 15, 2021, the sales representative (the "Sales Representative")

---

[4] TLO is a repository of PII that is maintained by a consumer credit reporting agency.

January 23, 2024
Page 10

who completed the fraudulent transaction reviewed surveillance video with the NYPD and recognized the customer as a particular repeat customer, later identified as Shepherd. (*Id.*).

On or about August 3, 2021, the NYPD responded to a 911 call from the Sales Representative who reported that Shepherd was again present at the Dealership, attempting to pick up auto parts. (*Id.* ¶ 49). Upon arrival, the NYPD placed Shepherd under arrest. At the time of his arrest, law enforcement seized approximately twenty credit cards held in the names of other people, as well as mail associated with many of those cards. (*Id.*). Twelve of the pieces of mail were destined for zip code 10012 in Manhattan—specifically, locations along the zip code's mail route 30 ("Route 30"). (*Id.*). For nine of those pieces of mail, Mompoint was the mail carrier assigned to Route 30 on the day the items were to be delivered. (*Id.*).

Despite his arrest, Shepherd continued to engage in fraud. (*Id.* ¶ 50). For example, as captured by surveillance video and copied below (from left to right), Shepherd completed the following fraudulent transactions (among others) after his arrest: Home Depot in Brooklyn (August 10, 2021); Home Depot in Brooklyn (August 15, 2021); and a big box electronic store (the "Electronics Store") in Manhattan (October 19, 2021). (*Id.* ¶ 50).






In addition, on or about December 18, 2021 at approximately 5:00 p.m., a return was made at luxury retailer on an account in the name of "Marcus Ford" for approximately $2,161.17, applied to account number ending in 2849. (*Id.* ¶ 51). The next day, at approximately 12:06 a.m., using the name "Kareem Shepherd," Shepherd made an online purchase at the same luxury retailer using credit number 2849 for approximately $2,112. (*Id.*).

*Shepherd's Involvement with LuxurySnob*

Shepherd coordinated not only with the postal carriers and other Shoppers to carry out the Scheme, but he was also directly involved with co-defendant Johnny Damus and assisted Damus by purchasing and transferring stolen goods to LuxurySnob. (*Id.* ¶ 52). Between on or about July 25, 2019, up to and including on or about September 6, 2019, Shepherd communicated with Damus and received instructions on items to purchase. (*Id.*). For example, on or about September 6, 2019, Damus sent Shepherd a link to a particular piece of merchandise on the LuxurySnob website with a message stating, "Need 3 of these." (*Id.* ¶ 53). A few hours later, Shepherd responded, in sum and substance, that he had obtained the requested merchandise. (*Id.*).

January 23, 2024
Page 11

## Relative Culpability

As shown below, because Shepherd actively participated in each aspect of this Scheme, he is one of the most culpable of the charged defendants. Notably, Shepherd also has, by far, the most serious criminal history of any of his co-defendants.

In an effort to capture the relative culpability of defendants in the case, the Government has arranged the defendants into three groups—each group including similarly situated defendants. Groups One and Two include non-postal employees, whereas Group Three captures postal employees. Group Three is presented as its own group in an attempt to capture the unique harm inflicted by the abuse of trust perpetrated by the postal employees in this Scheme. Within each group, the defendants are further arranged in generally descending order of culpability. The tables below reflect these groups and the Guidelines calculation applicable to each defendant. The Government will update these tables in future sentencing submissions to reflect the sentences imposed.

### Group 1

| Defendant | Counts of Conviction | Additional Stipulated Counts | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|---|
| Rashaan Richards* | 1 and 4 | | 26 | I (0 pts) | 63 to 78 mo. + 24 mo. | 24 mo. | |
| Johnny Damus* | 1 | | 26 | I (0 pts) | 63 to 78 mo. | None | |
| Kareem Shepherd | 1 and 4 | 5 | 23 | VI (14 pts)** | 90 mo. + 24 mo. | 24 mo. | |

* Indicates that the defendant received leadership points pursuant to U.S.S.G. § 3B1.1(b).

** Shepherd's plea agreement indicated that he had 15 criminal history points, which included two points under the § 4A1.1(d) of the 2021 Guidelines because he committed the instant offense while on parole. The Government agrees with Probation that under § 4A1.1(e) of the newly enacted 2023 Guidelines, Shepherd should receive one point because he committed the instant offense while on parole and had seven or more points under § 4A1.1(a)-(d). Under this calculation, Shepherd remains in criminal history category VI with 14 criminal history points.

### Group 2

| Defendant | Counts of Conviction | Additional Stipulated Counts | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|---|
| Devon Richards | 1 | 5 | 23 | II (3 pts) | 51 to 63 mo. | None | |

| Conrad Heron | 1 | | 23 | I (1 pt) | 46 to 57 mo. | None | |
|---|---|---|---|---|---|---|---|
| Louis Jeune Verly | 4 | | N/A | N/A | 24 mo. | 24 mo. | |

**Group 3 (Postal Employees)**

| Defendant | Counts of Conviction | Additional Stipulated Counts | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|---|
| Fabiola Mompoint | 1 and 5 | | 19 | II (2 pts) | 33 to 41 mo. | None | |
| Nathaneal Foucault | 1 and 5 | | 17 | I (0 pts) | 24 to 30 mo. | None | |
| Johnathan Persaud | 1 and 5 | | 13 | I (0 pts) | 12 to 18 mo. | None | 3 yrs. probation with 6 mos. home detention |

II. **Criminal History and Bail Revocation**

Shepherd's participation in the Scheme is far from his first involvement in fraud. Instead, his criminal history is littered with repeated financial crimes, beginning with a conviction in this District. He is a career financial criminal for whom fraud has become a way of life.

Specifically, in February 2012, in this District, Shepherd pleaded guilty to a conspiracy to commit mail fraud and healthcare fraud, in violation of 18 U.S.C. § 1349, for staging car accidents in order to commit no-fault insurance fraud. (*See* PSR ¶ 94). While on pretrial release in that case, he committed multiple violations, including violations of his curfew. When Shepherd was sentenced to 13 months' imprisonment, the Honorable John G. Koeltl warned him that "[v]iolations of supervised release have serious consequences" and that "if [he] were to treat his period of supervised release in the same way that he has treated his period of supervision prior to sentence," he "would face additional consequences." *United States v. Shepherd*, No. 11 Cr. 914 (JGK), Dkt. 26, at 12. Shepherd assured Judge Koeltl that he understood, stating that, "I have committed a crime to earn fast cash for my family. I have learned from my mistake, and I will never turn in that direction again." *Id.* at 8.

But Shepherd did not hold up his promise. Far from it. After being released from custody in December 2013, he was arrested in September 2014 for false personation, aggravated unlicensed operation of a vehicle, and unlawful possession of marijuana. In response, Judge Koeltl placed Shepherd on three months of home confinement.

In January 2015—while on home confinement—Shepherd was arrested again. This time, he was arrested in New Jersey for attempting to make purchases using fraudulent credit cards at a supermarket. Upon his arrest, law enforcement searched his vehicle and recovered, among other things, 50 fraudulent credit cards. In June and August 2015 respectively, Shepherd pled guilty to using those fraudulent credit cards in state court and in federal court as a violation of his supervised release.

Before Judge Koeltl was able to sentence Shepherd for his violation of supervised release, Shepherd was arrested four more times. These arrests were for (i) petit larceny, after attempting to steal a Versace belt from a department store in Brooklyn; (ii) grand larceny, after attempting to steal merchandise worth approximately $1,185 from a Home Depot in Brooklyn; (iii) criminal possession of a weapon in the fourth degree, specifically a gravity knife, and false personation, for providing law enforcement with a fake driver's license and identifying himself as "Kareem Connaught"; and (iv) unlicensed operation of a motor vehicle. These arrests are detailed in a June 13, 2016 Violation Report, filed by Probation (*see* Dkt. 90, Ex. A).

Shepherd then admitted to specifications related to all of these incidents. On November 1, 2016, Judge Koeltl revoked his term of supervised release and sentenced him to 90 days' community confinement, as well as two years' supervised release. *United States v. Shepherd*, No. 11 Cr. 914 (JGK), Dkt. 54.

While still on supervised release, Shepherd was arrested for several more crimes. Over the course of 2017, he was convicted of (i) possession of a forged instrument in the second degree for stealing mail, (ii) petit larceny for stealing merchandise from a store, (iii) criminal possession of stolen property for using a stolen credit card to make purchases at a luxury retailer, and (iv) identity theft for again making multiple purchases using stolen credit cards at another luxury retailer. Shepherd was released from prison on or about August 18, 2018, after serving an incarceratory sentence. He was then on parole until on or about June 1, 2020.

Following Shepherd's indictment in this case on or about September 27, 2022, the Government argued for his detention on dangerousness and risk of flight grounds. The Honorable Katharine H. Parker, United States Magistrate Judge, detained Shepherd until he could meet an extensive list of 16 conditions, including that he was to remain on home detention and not use the internet for purposes of advertising or selling goods. In imposing these conditions of release, Judge Parker explained to Shepherd that this was "an opportunity for you. You didn't comply with prior terms of release. This is an opportunity for you now to show that you can comply." (Dkt. 90, Ex. B at 36).

Shepherd initially appeared before this Court on October 19, 2022. On that date, the Court stated:

> Let me say to you, Mr. Shepherd, that I'm not going to disturb the bail decision that was made by the magistrate, other than to add that additional cosigner that I just mentioned. But I will tell you that your record gives me pause, and I will further tell you that I will not tolerate any violations of the conditions of your pretrial release.

> So, you're going to be on bail and there will be rules that you will have to follow and I'm telling you now that I'm going to require strict adherence to those rules. If you violate those rules, you should expect that the consequences are going to be severe.

(Dkt. 90, Ex. C at 5). Shepherd confirmed that he understood. (*Id.*).

On January 11, 2023, Pretrial Services filed a Violation Memorandum, explaining that Shepherd had violated the terms of his pretrial release on multiple occasions since his release. Specifically, despite repeated warnings from his Pretrial Services Officer, Shepherd made over a dozen unauthorized stops when traveling to/from work and Pretrial Services. These stops were often made at addresses with commercial establishments, including on several occasions, a Home Depot—a retailer where Shepherd repeatedly used stolen credit cards during his participation in the Scheme.[5]

On January 18, 2023, the Court remanded Shepherd, finding that it had "no confidence that if [Shepherd] was released he will abide by . . . conditions" of release and that Shepherd "is a danger to the community, given his long record of committing fraud." (Dkt. 91 at 13).

### III. The Plea and Guidelines Calculation

On September 5, 2023, Shepherd pleaded guilty to conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1029(b)(2) (Count One), and aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Four). (PSR ¶ 11). As part of his plea agreement, Shepherd stipulated that he conspired with others, including postal carriers employed by USPS, to steal credit cards from the mail, in violation of 18 U.S.C. § 371 (Count Five), and agreed that the Court may consider such conduct at the time of sentencing.

In his plea agreement, dated August 15, 2023, the parties agreed that Shepherd's Guidelines range for Count One and the Count Five stipulated conduct is 92 to 115 months' imprisonment, based on an offense level of 23 and a Criminal History Category of VI. In addition, the parties agreed that Count Four carries a mandatory sentence of 24 months' imprisonment, which must run consecutively to any other term of imprisonment and results in a Guidelines range of 116 to 139 months' imprisonment. Because the statutory authorized maximum sentence is 114 months—less than the minimum applicable Guidelines range of 116 months—the parties stipulated that Shepherd's Guidelines sentence is 114 months' imprisonment, 24 months of which must run consecutively to any other sentence imposed (the "Stipulated Guidelines Sentence"). In the PSR, the Probation Office has independently reached the same conclusion as to the applicable Guidelines sentence.

---

[5] As described above, Shepherd has previously used stolen credit cards at Home Depot stores during the Scheme, which has been captured on surveillance video. Although the Government does not have conclusive proof that Shepherd was engaging in fraud at Home Depot while on pretrial release, such behavior would be consistent with his actions during the Scheme.

January 23, 2024
Page 15

### IV. The Court Should Impose a Sentence of No Less than 84 Months' Imprisonment

The Government respectfully submits—and Probation agrees—that a sentence below the Stipulated Guidelines Sentence of 114 months' imprisonment, but no less than 84 months' imprisonment—24 months of which must run consecutively to any other sentence imposed[6]—as well as a substantial term of supervised release, is sufficient, but not greater than necessary, to serve the purposes of sentencing, particularly in light of the factors highlighted below.

*First*, the nature and seriousness of the offenses, as well as the circumstances of the offenses, warrants a significant sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). Shepherd engaged in a multi-year scheme that resulted in over $530,000 in actual loss and over $1.3 million in intended loss—an "unquestionably serious" offense. *United States v. Ojo*, 630 F. App'x 83, 86 (2d Cir. 2015) (describing wire fraud scheme with only $80,000 loss as serious); *see also United States v. Teman*, No. 19 Cr. 696 (PAE), 2019 WL 7041646, at *7 (S.D.N.Y. Dec. 20, 2019) (finding that bank fraud scheme with $297,000 loss to a financial institution was serious).

Beyond the financial harm inflicted by the Scheme, Shepherd's involvement in each part of the Scheme was consequential. He recruited and took advantage of postal works who were willing to abuse their positions of trust—those whom we must trust in order for the postal system, an important American institution, to work. He also stole and utilized the identities of unsuspecting citizens, likely causing headache and harm, in order to make use of the credit cards stolen from the mail. Through these actions, he helped make this sophisticated fraud work.

Shepherd's conduct warrants a substantial sentence of incarceration. Even if Shepherd initially became involved with the Scheme because he was in gambling debt, as he claims, the charges to which Shepherd pled guilty were not the result of a one-time act of desperation. He is not a young man who is ignorant to the possible consequences of criminal conduct. Instead, he is a career criminal whose charges are the consequence of his years-long participation in a sophisticated, deliberate, and profitable fraud.

*Second*, a sentence of at least 84 months' imprisonment reflects the defendant's history and characteristics and serves an acute need for specific deterrence and respect for the law. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A), (a)(2)(B). As described in detail above, Shepherd has an extensive criminal history of financial crimes, beginning with a 2012 conviction in this District for committing no fault insurance fraud. In the six years when he was at liberty before the Scheme began, Shepherd stole merchandise from various retailers, committed identity theft, stole mail, and used stolen credit cards to make purchases at luxury stores, among other things. None of these prior convictions—or their punishments, which often included terms of imprisonment—deterred him from engaging in the Scheme. Nor did supervision. In his prior case before Judge Koeltl, Shepherd violated his pretrial conditions of release, as well as his conditions of supervised release,

---

[6] Pursuant to 18 U.S.C. § 1028A(b)(3), "in determining any term of imprisonment to be imposed for the felony during which the means of identification was transferred, possessed, or used, a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account," the 24-month consecutive sentence it will be imposing on the Section 1028A conviction.

including by accumulating numerous arrests for financial crimes. He engaged in the Scheme while on parole. He continued to engage in the Scheme even after he was arrested for engaging in fraudulent transactions at the Dealership. And, despite clear warnings from his Court, he violated his conditions of pretrial release and was remanded. Shepherd has been given chance after chance and has vowed to never engage in criminal conduct again, but nothing has stopped him. Given this track record of persistent, brazen, and remorseless criminality, a lengthy sentence of incarceration is required to protect the public and to have some chance of deterring Shepherd from committing future frauds.

*Third*, a lengthy sentence is necessary to promote general deterrence. 18 U.S.C. § 3553(a)(2)(B). In addition to specific deterrence, general deterrence counsels in favor of such a sentence, given that "economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity" and as such are "prime candidate[s] for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)). If Shepherd were to receive the low sentence he seeks, there is little reason for others who are considering engaging in complex and profitable fraud schemes to be deterred from doing so.

In his submission, Shepherd requests a sentence "considerably lower" than 84 months' imprisonment. (Shepherd Sentencing Ltr. at 2). Among other things, Shepherd argues that such a sentence is warranted because the fraud Guidelines overstate the seriousness of the offense and because he has various personal mitigating factors, including that he suffered abuse as a child, has begun a supportive relationship, and has dealt with harsh conditions during his confinement at the Metropolitan Detention Center ("MDC"). (*See id.* at 3-7). The Government took these and other mitigating factors into account in recommending a below-Guidelines sentence, but none of these justifies the substantial variance that Shepherd seeks. Such a sentence would be shockingly low given the defendant's criminal history, paired with his extensive involvement in the sophisticated fraud scheme in the instant case. Shepherd makes four principal arguments in support of his sentencing request. They do not warrant the extraordinary sentence that he seeks.

*First*, Shepherd suggests that he deserves a lower sentence because he received a 14-point enhancement under U.S.S.G. § 2B1.1 because the loss in this case is more than $550,000 and less than $1,500,000. (Shepherd Sentencing Ltr. at 3-4). He argues that Section 2B1.1's loss table has been subject to criticism and overstates the gravity of fraud offenses. But the Government is not requesting a Guidelines sentence, linked to the loss table, in this case. Whatever the potential merits of this criticism may be in other contexts, they do not justify a sentence significantly lower than 84 months' imprisonment here where the Government's recommendation is tailored to the unique circumstances of this defendant.

As an initial matter, some have criticized the loss table because it is driven by intended loss, rather than actual loss. *See United States v. Corsey*, 723 F.3d 366, 377, 381 (2d Cir. 2013) (Underhill, J., concurring). That may be understandable where intended loss is difficult to foresee, but here, the only reason that there was not over $1.3 million in actual loss is that credit card companies declined certain of the transactions that were made using stolen credit cards. If it were solely up to Shepherd and his co-conspirators, the intended loss here would have been the actual

January 23, 2024
Page 17

loss, if not higher. And although Shepherd was not himself involved in every one of those transactions, he has admitted that he was aware of the scope of the Scheme and that he did his part to further it.[7]

Moreover, much of the criticism to which Shepherd points has been directed toward cases involving higher loss. *See Corsey*, 723 F.3d at 378-80 (Underhill, J., concurring) (expressing concern "the loss guideline [is] fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges"); Chief Judge Patti B. Saris, United States Sentencing Commission Chair, Remarks 2 (Jan. 9, 2015), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150109/Remarks.pdf ("the fraud guideline may not be fundamentally broken for most forms of fraud" because "sentences on average hew fairly closely to the guidelines for all but the highest dollar values, over $1 million in loss"). The loss bracket of $550,000 to $1.5 million does not give rise to the same concerns as some higher-loss cases.

*Second*, Shepherd argues that a low sentence is warranted because of his personal history, including abuse he suffered as a child, his role as a parent, and the support of his partner. (Shepherd Sentencing Ltr. at 4-6). The Government does not doubt the defendant's sincerity. But none of these factors, whether viewed individually or in combination, justify a sentence substantially below 84 months' imprisonment. As this Court is well aware, many defendants have suffered challenges in their childhood, yet are still sent to prison to serve significant sentences. And while the Government is sympathetic to any abuse Shepherd may have suffered as a child, his past may have justified a more lenient sentence during his first federal case or the many state cases that followed, but not here. Shepherd has had *a decade* to reflect on his crimes since the first time he expressed contrition to Judge Koeltl. But nothing has changed. Simply put, his prior brushes with the law did not convince him to change. In addition, his role as a parent and the support he gets from his current partner do not justify a lesser sentence, given that he had both of those things at the time he chose to engage in the Scheme. He even previously promised Judge Koeltl, after arguing for a lower sentence based on his children and his relationship at the time, that he had "learned from [his] mistake, and [he] will never turn in that direction again." That unfortunately was not the case.

*Third*, Shepherd seeks a sentence considerably below 84 months' imprisonment because has spent a year enduring the "harsh conditions" and frequent lockdowns at the Metropolitan Detention Center ("MDC"). (Shepherd Sentencing Ltr. at 6-7). Indeed, "lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary." *United States v. Pinto-Thomaz*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020); *see also United States v. Perez*, 22 Cr. 644 (JSR), Dkt. 84 at 578 (finding that conditions at the MDC did not constitute an exceptional

---

[7] In addition, even if the Guidelines required the Court to focus only on *actual* loss, Shepherd would receive a 12-point enhancement for the $536,434.01 in actual loss. This is less than $14,000 away from the 14-point enhancement applied using intended loss as a metric. In other words, the enhancement for the intended loss is only marginally greater than it would be for actual loss in this case. Even if the Guidelines relied on actual loss alone, the Government's sentencing recommendation in this case would be below even *that* Guidelines calculation. Shepherd fails to justify why a sentence even further below 84 months' imprisonment is warranted.

circumstance for bail, even where defendant argued that lockdowns would hinder his ability to participate in his legal defense). As a result, even when defendants were incarcerated at the height of the pandemic, courts have found that the conditions at the MDC did not warrant "significant Guidelines departure[s]" requested by defendants. *See United States v. Stewart*, No. 21 Cr. 42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *see also, e.g.*, *United States v. Sanchez*, No. 01 Cr. 74-2 (PAC), 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (finding, in context of compassionate release motion, that "the difficult—but generalized—prison conditions during the COVID-19 pandemic" do not constitute extraordinary and compelling circumstances for a defendant's release); *United States v. Boynton*, No. 20 Cr. 43 (RPK), 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (collecting cases to same effect).

*Fourth*, Shepherd argues that his future goals, as well as his good disciplinary record at the MDC, his completion of courses at the MDC, and his employment before he was incarcerated in this case, justify a low sentence. (Shepherd Sentencing Ltr. at 7-8). While the Government commends Shepherd's attempts at rehabilitation and hopes that he will become a productive member of society when is released, the Court should take little comfort in the "self-reflection" he has purported to engage in while incarcerated. (*Id.* at 7). Shepherd has been in and out of federal and state courts for financial crimes time and time again, and his future goals, while laudable, have never deterred him from engaging in these crimes to make a quick buck. At this point, a substantial incarceratory sentence must be imposed to serve the purposes of just punishment, deterrence, respect for the law, and to protect the public.

## V. Conclusion

For the reasons stated above, the Government submits that a significant incarceratory sentence of at least 84 months' imprisonment, comprising a 60-month sentence on Count One, to be followed by a 24-month mandatory consecutive sentence on Count Four, is appropriate in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: ___/s/___
Ashley C. Nicolas
Madison Reddick Smyser
Chelsea L. Scism
Assistant United States Attorneys
(212) 637-2467 / -2381 / -2105

cc: James Roth, counsel to the defendant